**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA,

CIVIL ACTION NO. 3:16-CR-00206

v.

(JUDGE CAPUTO)

CARRIE F. AKER and MARIO M.
VALENTINE,

Defendants.

## MEMORANDUM

Presently before this Court are two Motions to Suppress Evidence (Doc. 61, 62) filed by Defendant Carrie Aker and a Motion to Suppress Evidence (Doc. 57) filed by Mario Valentine. Because the Pennsylvania State Police ("PSP") failed to provide Defendant Aker *Miranda* warnings prior to her custodial interrogation on September 3, 2014, her statements to officers on that day will be suppressed. But, statements made by Defendant Aker on September 10, 2014 will not be suppressed because she was no longer in custody. Further, the non-testimonial evidence obtained during the search of Defendants' home on September 3, 2014 will not be suppressed because both Defendants offered voluntary consent for the search. Finally, the evidence obtained during searches of the Defendants' home and car on September 10, 2014, September 15, 2015, and September 25, 2015 will not be suppressed because the "fruit of the poisonous tree" doctrine is inapplicable. Thus, Defendant Aker's Motions to Suppress will be granted in part and denied in part, and Defendant Valentine's Motion to Suppress will be denied in its entirety.

### I. Background

**A.    Factual Background**

(1)    *The Initial Investigation*:

In early 2014, after receiving a number of reports regarding the use of fraudulent

credit cards in Northeast Pennsylvania, the PSP opened an investigation to determine the source of fake cards. (Transcript of December 20, 2017 Hearing ("Trans."), at 22:3-9.) During the course of the investigation, the PSP identified many individuals whose credit and debit card account information had been stolen to create counterfeit cards. (Tans., at 22:3-9, 21-23.) The counterfeit cards recovered as a result of this investigation had at least one common feature: the name on the fake cards was either Kelly Turano or Amstrong Drigo.

The PSP secured video surveillance footage from many of the retail locations where the counterfeit cards were used. (Trans., at 22:10-20.) After reviewing this footage, the PSP concluded that individuals using the counterfeit cards were Defendants Carrie Aker and Mario Valentine. (Trans., at 22:17-20.)

By the end of the summer of 2014, the PSP had linked Defendants to tens of thousands of dollars of fraudulent credit and debit card activity. (Trans., at 22:21-23.)

(2)    *Events of September 3, 2014*:

Following the initial investigation, five PSP officers visited Defendants' home. (Trans. 24:18-22.)It is undisputed that these officers visited Defendants' home without a search or arrest warrant.[1] (Trans., at 23:8-9.) Upon arrival at the Defendants' home, officers approached the front door of the residence and knocked. (Trans., at 25:10-11; 28:8-14.) Defendants did not answer. (Trans., at 29:3-4.) However, the officers believed the house was occupied because they testified they heard people speaking inside. (Trans. 29:5-11.) In an attempt to determine if Defendants were home, the officers walked into the backyard. (Trans., at 29:12-14; 33:3-8.) They reached the backyard by walking down a public sidewalk

---

[1]    Notably, however, PSP officers had drafted a search warrant application prior to arriving at the Defendants' residence. (Trans., at 64:7-10.) Officers testified that they brought the application with them on September 3, 2014. (Trans., at 112:6-11.) Additionally, the officers believed that they had acquired enough evidence prior to September 3 to support a probable cause finding and the issuance of a search warrant.

2

and through an open gate[2] at the rear of the residence. (Trans., at 31-32.) As officers proceeded to the backyard, officers began calling out the Defendants by name. (Trans., at 32:23-25.) Responding, Defendant Aker opened the backdoor and was immediately confronted by five PSP officers. (Trans., at 33: 1-6.)

Defendant Aker informed the PSP officers that she was preparing her children for school, and the officers explained that they were there to speak with her about her involvement in a credit card fraud scheme. (Trans., at 33:11-15.) Notably, the officers "allowed" Aker to get the children ready for school prior to questioning her about the alleged fraud. (Trans., at 147:8-16; 148:1-23; 188:4-6.) While Aker prepared the children for school, the officers waited on the front porch. (Trans., at 34:5-8.) As the children left for school with their father, Defendant Valentine, one officer went with them and later returned home with Valentine.(Trans., at 36:1-9; 37:1-5.) Once Valentine returned home, five officers entered the Defendants' home. (Trans., 38:1-19;191:18-25.) Whether or not the Defendants provided consent to enter the home is disputed. Upon entering the house, Defendant Aker was questioned in the living room, and Defendant Valentine was questioned on the front porch. (Trans., at 39:8-17; 43:2-7.) At the conclusion of Defendant Valentine's interrogation he returned into the house to join Defendant Aker in the living room. (Trans., at 43:12-13.)

Defendants were questioned for more than two hours.[3] (Trans., at 90:22-23; 91:6-17; 150:11-15.) It is undisputed that Defendants were never provided with *Miranda* warnings. During this wide ranging interview, Defendants divulged a significant amount of information that clearly implicated them in a fraudulent scheme to produce and use counterfeit credit and debit cards. (*See, e.g.*, Trans., at 41-42; 58.)

At the conclusion of the interrogation, the officers requested Defendants' consent to

---

[2]     The existence of the gate is disputed. (Trans., at 30:15-22.) But, I find that even if a gate did exist, it was open for the officers to walk through.

[3]     While at least one officer noted that the interrogation lasted "over one hour," the government in its brief in opposition explains that the interrogation took approximates 2.5 hours. (Trans., at 41:10-11.)

search their home and cars.[4] (Trans., at 45:17-24.) And, Defendants did consent. (Trans., at 47:1-6; 48:1-12.)

Having obtained consent for a search, the officers proceeded to search the Defendants' home and cars. They discovered a trove of evidence. (Trans., at 51:1-6.; 52:15-19.) For example, officers found a number of counterfeit credit cards, receipts of purchases made with counterfeit credit cards, and the laptop used to connect with black market suppliers of stolen account numbers. (*Id.*) The government describes this search as a "cooperative" effort between the PSP and Defendants. (Trans., at 50:8-10.) The search ended prior to Defendants' children returning from school. (Trans., at 50:15-22.)

(3)    *Events of September 10, 2014*:

Less than a week after interviewing the Defendants and executing the first consent search, PSP Detective Everk contacted Defendant Aker by phone. (Trans., at 58:10-14.) Everk wanted to know if Defendant Aker would be willing to meet with him and a special agent from the Department of Homeland Security to discuss the black market website she used to obtain stolen account numbers. (Trans., at 58:15-19.) Aker agreed. (Trans., at 58:20-25.)

On September 10, 2014, Detective Everk and an agent from Homeland Security visited Defendants' home. (Trans., at 59:1-8.) At that time, Detective Everk conducted a second interview of both Defendants. (Trans., 60:14-19.) The interrogation focused on their

---

[4]    The government suggests that they politely asked for consent to search and provided Defendants some time to speak alone to make a decision. They further claim that Defendants agreed to the search on condition that the search was concluded before their children returned from school. Defendants tell a very different story. They claim that they were coerced into consenting to the search. Defendants suggest that the officers told them that they: (1) could call and get a warrant if needed; (2) would call child protective services if Defendants did not sign the consent form; and (3) that they would arrest Defendants immediately if they failed to consent to the search. At bottom, Defendants claim that they agreed to the search after they caved to the pressure of a lengthy interrogation and multiple threats.

connection to a broader network of individuals stealing account numbers and their use of a black market website. (*Id.*) Again, no *Miranda* warnings were provided. At the conclusion of Defendants' interrogation, Defendants consented to a second search that included a search of the electronic devices seized from the residence on September 3rd. (Trans., at 60:20-25; 61:1-23.)

    (4)   *The Execution of the September 15, 2015 Search Warrant*:

After the second interview with Defendants in September of 2014, the investigation continued. (Trans., at 62:14-16.) The information the PSP obtained from Defendants allowed them to conclude that Defendants' scheme was broader than originally suspected. Following this additional investigation, on September 15, 2015, the PSP sought and obtained a search warrant for Defendants' home to recover items left behind the prior year. (Trans., 63:1-17.) When PSP officers arrived to search the home, neither Defendant was at the residence. (Trans., 66:17-20.) However, the search occurred despite their absence. (*Id.*)

The search was fruitful. The PSP expected to find evidence that the Defendants were counterfeiting credit and debit cards. And, they did. (Trans., at 66:21-23.) Surprisingly, officers also found evidence suggesting that Defendants were also counterfeiting drivers' licenses. In other words, the PSP acquired evidence not only suggesting that Defendants had continued their criminal activity, but also that Defendants' criminal enterprise expanded.

During the course of the search, Defendant Valentine's father arrived at the house and advised that Defendants were at a concert in Chicago. (Trans., at 69:1-4.) Ultimately, he connected the PSP officers on scene with Defendant Aker via telephone. (Trans., at 69:5-7.) Defendant Aker conveyed that both Defendants would be back in Pennsylvania shortly. ((Trans., at 69:8-18). At that time, the PSP made plans to arrest the Defendants and entered arrest warrants for each Defendant into law enforcement databases. (Trans., at 69:22-23.)

    (5)   *Defendant's Arrest on September 25, 2015*:

On September 25, 2015, Defendants were identified during a routine traffic stop by

a PSP officer in Lehigh County. (Trans., at 169:3-18.)The PSP officer learned that both Defendants had outstanding arrest warrants and conducted the arrests. (Trans., at 170-172.) Following the Defendants' arrest, the PSP officer conducted a post-arrest inventory search of Defendants' rental car. (Trans., at 172:11-15.) In the car the officer discovered dozens of counterfeit credit cards and devices that could be used to create additional counterfeit cards. (Trans., at 173: 2-15.)

## B.    Procedural History

The government secured an indictment against Defendant Aker and Defendant Valentine on July 26, 2016. The indictment contains nine counts charging Defendants with: (1) Conspiracy to Commit Wire Fraud; (2) Aggravated Identity Theft (Aker); (3) Aggravated Identity Theft (Valentine); (4) Access Device Fraud; (5) Possession of Counterfeit Access Devices (two counts); (6) Possession of Device-Making Equipment (two counts); and (7) Money Laundering Conspiracy. On August 16, 2016, both Defendants pled not guilty to all counts of the indictment.

On August 18, 2017 Defendant Valentine filed his instant Motion to Suppress.[5] Defendant Aker filed two Motions to Suppress on August 26, 2017. The first motion seeks to suppress the physical evidence obtained by the government, and the second seeks to suppress the statements made by Defendant Aker. The government responded to both Defendants' Motions in a single Omnibus Brief in Opposition.

Defendants' Motions have been fully briefed and are ripe for review.

## II. Legal Standards

## A.    Fifth Amendment

The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const.

---

[5]    Defendant Valentine only seeks to suppress the physical evidence obtained during the searches executed by the PSP on September 3, 2014, September 10, 2014, September 15, 2015, and September 25, 2015.

amend. V. To protect this right, the Supreme Court in *Miranda v. Arizona* held that police may not conduct a custodial interrogation without first administering the now-familiar *Miranda* warnings, which include the right to remain silent and the right to the presence of an attorney. *See* 384 U.S. 436, 479 (1966); *see also Dickerson v. United States*, 530 U.S. 428, 443-44 (2000) (revisiting and reaffirming *Miranda*). In general, if a suspect is not so warned the prosecution is barred from using statements obtained during the interrogation to establish its case in chief. *See Michigan v. Harvey*, 494 U.S. 344, 350 (1990); *United States v. Leese*, 176 F.3d 740, 743 (3d Cir. 1999) ("A defendant's statements made in the course of a custodial interrogation are not admissible as evidence unless the defendant received appropriate warnings, or an exception applies."). *But see Harris v. New York*, 401 U.S. 222, 224-26 (1971) (holding that statements obtained in violation of *Miranda* may be admitted for impeachment purposes).[6] Both inculpatory and exculpatory statements fall within the ambit of *Miranda*. 384 U.S. at 444.

*Miranda* warnings must be provided when an individual is "(1) 'in custody' and (2) subject to 'interrogation' by the Government." 384 U.S. at 444. "For a person to be in custody when he has not been arrested, 'something must be said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates that they would not have heeded a request to depart or to

---

[6]     While "statements made by a defendant in circumstances violating . . . *Miranda* . . . are admissible for impeachment if there trustworthiness . . . satisfies legal standards[,] . . . any criminal trial use against a defendant of his involuntary statement is a denial of due process of law. . . ." *Mincey v. Arizona*, 437 U.S. 385, 397-98 (1978) (emphases and third omission in original) (internal quotation marks omitted). A statement is involuntary when the suspect's "will [is] overborne in such a way as to render his confession the product of coercion." *Arizona v. Fulminante*, 499 U.S. 279, 288 (1991). Whether a statement is voluntarily made is determined from "'the totality of all the surrounding circumstances-both the characteristics of the accused and the details of the interrogation.'" *Dickerson*, 530 U.S. at 434 (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973)).

allow the suspect to do so.'" *United States v. Taylor*, 22 F. Supp. 3d 387, 390 (M.D. Pa. 2014) (Caputo, J.) (citing *United States v. Willaman*, 437 F.3d 354, 359 (3d Cir. 2006)).[7] The determination of "custody" is an objective inquiry, that is, what a reasonable person would have believed based on the circumstances of the interrogation. *See United States v. Leese*, 176 F.3d 740, 743 (3d Cir. 1999). An "interrogation" has been defined as "conduct intentionally designed to evoke a confession, as well as any conduct an officer should reasonably have foreseen would elicit an inculpatory response." *United States v. Bonner*, 469 Fed. App'x. 119, 126 (3d Cir. 2012) (citing *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)). The term "interrogation" includes express questioning and any words or actions on the part of the police "that the police should know are reasonably likely to elicit an incriminating response." *Innis*, 446 U.S. at 301. Consequently, an officer cannot be held responsible for an unforeseeable statement by the suspect. *Id.* at 301-02.

As a general rule, the burden of proof is on a defendant who seeks to suppress evidence. *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995). However, once the defendant has established a basis for his motion, the government is required to prove by a preponderance of the evidence that the defendant's statements were not the product of custodial interrogation. *See, e.g.*, *United States v. DeSumma*, 44 F. Supp. 2d 700,

---

[7]    In *Willaman*, the Third Circuit stated that "[c]ourts consider a variety of factors when determining if a person was in custody, including: (1) whether the officers told the suspect he was under arrest or free to leave; (2) the location or physical surroundings of the interrogation; (3) the length of the interrogation; (4) whether the officers used coercive tactics such as hostile tones of voice, the display of weapons, or physical restraint of the suspect's movement; and (5) whether the suspect voluntarily submitted to questioning." 437 F.3d at 359-60. This list of factors is not exhaustive. Another relevant factor courts have considered is "whether the officer revealed his or her belief that the suspect was guilty." *United States v. Jacobs*, 431 F.3d 99, 105 (3d Cir. 2005). Considering the circumstances surrounding the interrogation, the ultimate inquiry is "whether there [was] a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *Stansbury v. California*, 511 U.S. 318, 322 (1994) (citations omitted).

703 (E.D. Pa. 1999); *see also United States v. Barnes*, 2005 WL 1899502, at *2 (E.D. Pa. Aug. 8, 2005); *United States v. Prince*, 157 F. Supp. 2d 316, 324 (D. Del. 2001).

**B.     Fourth Amendment**

The Fourth Amendment to the United States Constitution protects individuals "right . . . to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures. . . ." U.S. Const. amend IV. It is a "basic principle of Fourth Amendment law," that "searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 585 (1980); *see also United States v. Coles*, 437 F.3d 361 (3d Cir. 2006). But, the Supreme Court has noted that "this presumption may be overcome in some circumstances" *Kentucky v. King*, 563 U.S. 452, 460 (2011) (citing *Brigham City v. Stuart*, 547 U.S. 398, 394 (1978)). One such circumstance exists where an individual provides the government consent to search their home. *Id.* at 463. In order for a consent search to pass constitutional muster, the consent provided must be (1) voluntary and (2) given by a person with the authority to consent to the search. *See, e.g.*, *United States v. Matlock*, 415 U.S. 164, 172 n.7 (1974); *Bustamonte*, 412 U.S. 218, 223 (1993). Voluntariness is determined by examining the totality of the circumstances.[8] *See Bustamonte*, 412 U.S. at 223; *United States v. Price*, 558 F.3d 270, 279 (3d Cir. 2009).

### III. Discussion

**A.     The Interrogation and Search on September 3, 2014**

Defendant Aker contends that the statements she made to the PSP on September

---

[8]     "We consider such factors as age, education, and intelligence of the subject; whether the subject was advised of his or her constitutional rights; the length of the encounter, the repetition or duration of the questioning; and the use of physical punishment. The setting in which the consent was obtained [and] the parties' verbal and non-verbal actions are also relevant." *United States v. Stabile*, 633 F.3d 219, 231 (3d Cir. 2011) (citing *Schneckloth*, 412 U.S. at 226; *Price*, 558 F.3d at 278; *United States v. Givan*, 320 F.3d 452, 459 (3d Cir.2003).

3, 2014 should be suppressed because she made statements absent *Miranda* warnings during a custodial interrogation. Notably, Defendant Valentine has not moved to suppress any statements made during his interaction with the PSP on September 3rd. But, both Aker and Valentine have moved to suppress physical evidence obtained during a search of their home and cars on that day. Defendants claim that the evidence obtained during this search should be suppressed because the PSP did not have a warrant and any consent obtained was rendered involuntary as a result of unlawful coercion.

(1)    Statements made by Carrie Aker on September 3, 2014:

The first question before me is whether or not Defendant Aker was in custody and subject to interrogation on September 3, 2014. As a preliminary matter, it is clear that Aker was subject to interrogation.[9] Therefore, if Aker was "in custody," her statements made to the PSP on September 3rd must be suppressed because it is undisputed that she was not provided *Miranda* warnings.

Remember, on September 3rd Aker was confronted by five PSP officers. Those officers arrived at Aker's home at 8 a.m. and proceeded to knock on her front door. At first, Aker did not answer, so the officers decided to walk around the house in search of both Aker and Valentine. After hearing officers yell her name, Aker came outside through the home's back door to meet the officers standing in her backyard. There, officers explained that they were there to discuss Aker's involvement in a credit card fraud scheme. Additionally, the officers explained that they would "allow" Aker to get her children ready for school before subjecting her to questioning about the alleged fraud. The PSP officers

---

[9]    Here, PSP officers "should reasonably have foreseen" that asking specific questions about Defendants' allegedly unlawful scheme "would elicit an inculpatory response." *Bonner*, 469 Fed. Appx. at 126 (citing *Innis*, 446 U.S. at 301). In fact, PSP officers testified that they intended to elicit such responses from Aker when they approached her residence on September 3rd. (Trans., at 23:18-20.)

waited on Aker's front porch as she prepared the children for school, and an officer accompanied Defendant Valentine and the children on their walk to school.[10] Once inside the home, officers interrogated both Defendants for more than two hours. PSP officers controlled the movement of both Aker and Valentine, and Aker and Valentine were never left unattended.[11]

Aker claims that these circumstances rendered her "in custody" because a reasonable person would not have felt that she could have expelled the PSP officers from her home or terminated the interrogation.

To determine whether or not Aker was "in custody" I first turn to the factors laid out by the Third Circuit in *Willaman*. The *Willman* Court explained that "[c]ourts consider a variety of factors when determining if a person was in custody, including: (1) whether the officers told the suspect he was under arrest or free to leave; (2) the location or physical surroundings of the interrogation; (3) the length of the interrogation; (4) whether the officers used coercive tactics such as hostile tones of voice, the display of weapons, or physical restraint of the suspect's movement; and (5) whether the suspect voluntarily submitted to questioning." 437 F.3d at 359-60.

---

[10] Testimony suggested that Valentine and the children were followed for two reasons. First, officers wanted to make sure Valentine would return. The PSP had encountered "others" ran away in similar situations. (Trans., at 194:20-25.) Second, they explained that they were concerned about officer safety because they did not know what Valentine would pick up on the way back to the residence. Such concern for safety, however, is curious. (Trans., at 36:5-12; 225:3-20.) Neither Aker nor Valentine were ever frisked and a protective sweep of the home was never conducted. (Trans., 38:12-13; 39:3-4.) Further, the defendants were not being investigated for a violent crime, and the defendants did not have a criminal history.

[11] Officers separated the Defendants, choosing to question Defendant Valentine on the front porch and Defendant Aker in the living room.

First, the government has offered no evidence to suggest that Aker was specifically told that she was free to leave or refuse questioning. Rather, PSP officers testified that they "allowed" Aker to prepare her children for school prior to answering their questions. There is little doubt that Aker was under the control of the PSP because they did not explicitly note that Aker was free to leave, and because the officers controlled Aker's actions by exercising authority over her actions at the outset of their interaction.[12] Thus, the first *Willaman* factor weighs in favor of finding Aker in custody.[13] *See United States v. Taylor*, 22 F. Supp. 3d 387, 391 (M.D. Pa. 2014) (Caputo, J.). Second, the interrogation took place in Aker's home. An interrogation conducted within one's home is not *per se* custodial. *See Beckwith v. United States*, 425 U.S. 341, 342-43, 347 (1976). On the contrary, courts have generally found that an interrogation occurring within the confines of one's home lessens the coercive nature of the interaction. *See, e.g.*, *Willaman*, 437 F.3d at 359-360 ("When a person is questioned on his own turf, . . . the surroundings are not indicative of the type of inherently coercive setting that normally accompanies a custodial interrogation."); *United States v. Rodriguez*, No. 9-219, 2010 WL 1485704, *7 (M.D. Pa. 2012) (Kane, J.) ("[C]ourts are more likely to find that a Defendant is not in custody when he is in the comfort of his own home."). But, this does not mean that one cannot be in custody within their home. *See Orozco v. Texas*, 394 U.S. 324, 326 (1969); *see also Taylor*, 22 F. Supp. 3d at 391-92. Rather, one can be considered "in custody" within their own home if the home is dominated by police.

---

[12]   The PSP officers' suggestion that they would "allow" Aker to prepare the children for school indicates that the officers believed and communicated that they had the authority *not* to allow Aker time to prepare her children for school. In other words, Aker– or a reasonable person in Aker's position–would have felt as if she was under the control of the PSP.

[13]   The Government's reference to *Stansbury* in its brief is not convincing. Here, Aker was not only presented with a statement by police that she was a prime suspect–like the defendant in *Stansbury*–but also a statement that implied she was under the control of the PSP.

*See, e.g.*, *United States v. Craighead*, 539 F.3d 1073, 1083-84 (9th Cir. 2008); *United States v. Mittel-Carey*, 493 F.3d 36, 40 (1st Cir. 2007) (finding that an individual was in custody within his home because of the "level of physical control the agents exercised over" him); *United States v. Revels*, 510 F.3d 1269, 1275 (10th Cir. 2007) (concluding that an individual's home became a "police-dominated" environment and was therefore not the "traditional comfortable environment that [the court] would consider a neutral location for questioning."). Here, Aker was confronted in her home by five armed PSP officer at approximately 8 a.m.. While not dispositive, the presence of these officers under the circumstances here present weighs in favor of a finding of custody. *Craighead*, 539 F.3d at 1085 (the presence of eight armed officers in the home weighed in favor of finding that the suspect was in custody); *Mittell-Carey*, 493 F.3d at 40 (same). Third, an interrogation lasting "several hours" absent *Miranda* warnings will weigh in favor of a finding that the individual interrogated was in custody. *United States v. King*, 604 F.3d 125, 138 (3d Cir. 2010); *see also United States v. Bassignani*, 560 F.3d 989, 1000 (9th Cir. 2009) (explaining that the District Court had not erred in finding that a two and a half hour interrogation absent *Miranda* warnings favored a finding that a suspect was in custody). Here, Aker was questioned for more than two hours. Thus, the third *Willaman* factor also weighs in favor of finding that Aker was in custody. Fourth, there was no evidence presented that officers used overtly coercive tactics, such as displaying a firearm or applying physical restraints to Aker. For this reason, the fourth factor weighs against a finding of custody. Finally, Aker did not seek out the police for the interview or invite them into her home for the interrogation. Rather, she complied with an instruction given by PSP officers to answer questions when they arrived, unannounced, at her home. Further, it is inaccurate to characterize Aker's original interaction with the officers as setting a condition for the interrogation. Aker was specifically told by PSP officers that she would be "allowed" to get her children ready for

school before the interrogation began. This strongly implies that the officers conveyed the belief that they had the requisite control to deny her that ability; she was not setting a condition, but complying with what seemed like an order. For this reason, the fifth and final *Willaman* factor weighs in favor of a finding of custody.

The *Willaman* factors weigh in favor of finding that Aker was in custody on September 3, 2014.

However, the *Willaman* factors are not exhaustive. As such, I not only balance the *Willaman* factors, but also consider the officers' belief about a suspect's culpability and whether the officers shared their belief with the suspect. *See Stansbury v. California*, 511 U.S. 318, 325 (1994) ("An officer's knowledge or beliefs may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned."); *Steigler v. Anderson*, 496 F.2d 793, 799 (3d Cir. 1974) (same). The Third Circuit has stated that an officer will be more likely than not to "bear down" during an interrogation of a suspect the officer believes committed a crime. *Steingler*, 496 F.2d at 799 ("The more cause for believing the suspect committed the crime, the greater tendency to bear down in interrogation and create the kind of atmosphere of significant restraint that triggers *Miranda*." (quoting *United States v. Hall*, 421 F.2d 540, 545 (2d Cir. 1969))); *see also Jacobs*, 431 F.3d at 105. Thus, when an officer begins an interrogation believing the suspect had committed the crime at issue, the likelihood that the suspect is in custody also increases. *Id.* Here, the testimony of the PSP officers made clear that they not only had a reason to believe Aker had orchestrated a credit card fraud, but believed they had enough evidence prior to September 3rd to support a search warrant. Because the officers believed Aker committed a crime prior to the interrogation, it is more likely that Aker was in custody because such a belief has a tendency to "create the kind of atmosphere of significant restraint that triggers *Miranda*." *Steingler*, 496 F.2d at 799. Moreover, there is no doubt that

the officers' expressed their belief that Aker had committed the fraud. In fact, PSP officer's went so far to explain to Aker that they had video surveillance of her using a number of fake cards. (Trans., at 192:10-15.)   A reasonable person in Aker's position would have felt as if she was either under arrest or could have been placed under arrest at any moment. This weighs in favor of finding that Aker was in custody.

After a review of the relevant factors, I will find that Defendant Aker was in custody during the interrogation on September 3rd. Since Aker was not provided *Miranda* warnings prior to her custodial interrogation, any statement made to the PSP officers on September 3rd will be suppressed.

    (2)   <u>Search of the Aker & Valentine Residence on September 3, 2014</u>

Next, Defendants argue that the search of their home and cars on September 3, 2014 violated the Fourth Amendment, and the evidence seized must be suppressed. Because the PSP conducted a search within Defendants' home without a warrant, the search is presumptively unreasonable. *See Payton*, 445, U.S. at 585. Nevertheless, the warrant requirement–and accompanying presumption of reasonableness–is excused when consent to the search is provided by one with the power to provide such consent. *See, e.g.*, *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990); *Matlock*, 415 U.S. 164 at 172 n.7; *Bustamonte*, 412 U.S. at 223. Notably, however, '[t]o justify a search based on consent, the government has the burden of proving that consent was, in fact, freely and voluntarily given." *Price*, 558 F.3d at 277-78.

Here, there is no question that Defendants had the power to provide the requisite consent and signed a consent form for the search. So, the critical question before me is: did the defendants offer voluntary consent? As mentioned, voluntariness is determined by the totality of the circumstances. *See Id.* at 278. The factors to include in this analysis are: "the age, education, and intelligence of the subject; whether the subject was advised of his

or her constitutional rights; the length of the encounter; the repetition or duration of the questioning; and the use of physical punishment." *Id.*

Based on the totality of the circumstances, the Defendants voluntarily consented to a search of their residence and cars. The Defendants were informed of their right to refuse. Prior to obtaining consent and conducting the search, PSP officers provided Defendants with a consent form. The consent form specifically stated, in bold and capitalized font, "I have been told that I do not have to give my consent. I have the right to refuse this request, and that the police may not be able to conduct this search without a search warrant unless I give my consent." (Trans., at 49:4-18.) Such warning was sufficient to notice Defendants of their right to refuse and weighs heavily in favor of finding that the consent was voluntary. *See United States v. Sepling*, No. 11-cr-0195, 2012 WL 1356712, at *6 (M.D. Pa. Apr. 19, 2012) (Caputo, J.). Additionally, the officers did allow Defendants to discuss their option to refuse in private. Moreover, defendants consented to the search on the condition that the search would be complete prior to their children's return from school. (Trans., at 50:15-22.) This conditional consent suggests that the Defendants were aware that they could have withheld consent, and quite possibly even contemplated withholding consent. Finally, due to the language contained within the consent form, as noted above, I do not find Defendants credible[14] with respect to their claims that officers stated they: (1) could call and get a warrant if needed; (2) would call child protective services if Defendants did not sign the consent form; and (3) would arrest Defendants immediately if they failed to consent to the

---

[14]    The testimony of both Aker and Valentine were replete with inconsistencies or blatant half-truths. For example, Valentine concluded that a fake driver's license with his photo and an alias's name came to be on his person by mere happenstance. Even after being presented with the license, Valentine refused to acknowledge that he had used the alias in the past. (Trans., 220:13-25; 221:1-11.)

search. Therefore, I find that Defendants offered voluntary consent for the search.[15]

It is also important to note that "consent to search can be voluntary – and therefore Fourth-Amendment compliant – notwithstanding the fact that it was given while a defendant was in custody without having received Miranda warnings." *United States v. Brown*, 627 Fed. App'x. 163, 166 n.4 (3d Cir. 2015) (quoting *United States v. Renken*, 474 F.3d 984, 987-88 (7th Cir. 2007)); *cf. United States v. Watson*, 423 U.S. 411, 424 (1976) ("[T]he fact of custody alone has never been enough in itself to demonstrate a coerced confession or consent to search."). This means that my finding that Defendant Aker was in custody for Fifth Amendment purposes on September 3rd is not at odds with a finding that she voluntarily consented to the search.

Because valid consent was secured, the search at issue does not run afoul of the Fourth Amendment. Thus, the evidence seized by the PSP on September 3rd will not be suppressed, and Defendants' Motions will be denied.

**B.      The Search & Interrogation on September 10, 2014**

(1)      Search of the Aker & Valentine Residence on September 10, 2014:

Next, Defendants claim that the search of Defendants home and electronic devices on September 10, 2014 was unconstitutional and the evidence obtained should be suppressed because this evidence was acquired as a result of unconstitutionally obtained information during the search and interrogation that took place on September 3, 2014. Stated differently, Defendants are invoking the "fruit of the poisonous tree" doctrine which bars the use of evidence that was obtained as a result of the government's exploitation of unconstitutionally obtained information. *See generally, Wong Sun v. United States*, 371 U.S. 471 (1963). But, the "fruit of the poisonous tree" doctrine does not apply here.

---

[15]      This does not mean that the PSP's actions were ideal; officers should not have waited until concluding a multi-hour interrogation before requesting consent. But, the length of the interaction with police is not dispositive.

As discussed above, the PSP interaction with Defendants on September 3rd did not result in a Fourth Amendment violation. Therefore, the only basis to support the application of the fruit of the poisonous tree doctrine is the Fifth Amendment. However, a violation of *Miranda* is not sufficient to preclude evidence obtained as a result of statements given absent a proper warning. *See. e.g.*, *Oregon v. Elstad*, 470 U.S. 298, 306-09 (1985); *United States v. DeSumma*, 272 F.3d 176, 178 (3d Cir. 2001) ("[T]he fruit of the poisonous tree doctrine does not apply to derivative evidence secured as a result of a voluntary statement obtained before *Miranda* warnings are issued."); *United States v. Elie*, 111 F.3d 1135, 1142 (4th Cir. 1997) ("[D]erivative evidence obtained as a result of an unwarned statement that was voluntary under the Fifth Amendment is never "fruit of the poisonous tree."); *United States v. Sangineto-Miranda*, 859 F.2d 1501, 1515 (6th Cir. 1988) ("[W]here police simply fail to administer *Miranda* warnings, the admissibility of nontestimonial physical evidence derived from the uncounseled statements should turn on whether the statements were voluntary within the meaning of the Fifth Amendment."). Rather, derivative evidence is suppressed only where the Fifth Amendment itself is violated, which occurs when a statement is involuntary. *See Elstad*, 470 U.S. at 305. In other words, a statement made absent *Miranda* warnings is not enough to suppress non-testimonial-derivative evidence; a showing of actual coercion is required.

Defendant Aker has alleged that the statements she made on September 3rd were coerced. Specifically, Aker suggests that PSP officers explained that if she was not cooperative they would begin investigating her eldest daughter's involvement in the fraud. (Trans., at 94:1-10.) Additionally, Aker noted that the officers threatened to contact child protective services if she did not cooperate. (Trans., at 196:22-25; 197:1-2.) However, I did

not find these allegations credible.[16] For this reason, the statements provided to the PSP on September 3rd will be considered voluntary. Thus, the fruit of the poisonous tree doctrine will not apply to suppress the evidence obtained by police on September 10th.

    (2)    <u>Statements of Carrie Aker on September 10, 2014</u>:

Defendant Aker also claims that the statements she made to the PSP on September 10th should be suppressed. Remember, one week after interviewing the Defendants and executing the consent search, PSP Detective Everk contacted Defendant Aker by phone. Everk wanted to know if Defendant Aker would be willing to meet with him and a special agent from the Department of Homeland Security to discuss the black market website she used to obtain stolen account numbers. Defendant Aker agreed. Having agreed to meet, Aker scheduled a time to allow Everk to return to the home: September 10, 2014. On September 10th, Detective Everk and an agent from Homeland Security visited Defendants' home, and Everk conducted a second interview of both Defendants. Again, no *Miranda* warnings were provided.

The critical question presented here is whether Defendant Aker was subject to a custodial interrogation absent *Miranda* warnings on September 10th. The same analysis that governed this question with respect to Aker's September 3rd statements controls here. As a preliminary matter, there is no question that Aker was interrogated without first receiving *Miranda* warnings. Thus, if Aker was "in custody," *Miranda* requires suppression. However, Aker was not "in custody" on September 10th.

---

[16]    The only evidence offered to support the claim of coercion was the testimony of Aker and Valentine. The testimony of both Aker and Valentine were replete with inconsistencies or blatant half-truths. For example, Valentine concluded that a fake driver's license with his photo and an alias's name came to be on his person by mere happenstance. Even after being presented with the license, Valentine refused to acknowledge that he had used the alias in the past. (Trans., 220:13-25; 221:1-11.)

The *Willaman* factors weigh in favor of a finding that Aker was not in custody on September 10th. Aker's interaction with police was substantially different on September 10th as compared to September 3rd. Three facts highlight the difference in the two interactions: (1) Aker invited police back to her home on September 10, 2014; (2) only two law enforcement officials were present at Aker's home; and (3) Aker does not contend that the interrogation lasted a significant period of time. In light of these facts, all but one *Willaman* factor weighs in favor of finding that Aker was not in custody.[17] Because Aker was not in custody, *Miranda* warnings were not required prior to her questioning. Therefore, suppression of Aker's statements would be improper.

Additionally, Aker's attempt to apply the "fruit of the poisonous tree" doctrine to suppress statements made on September 10th is misguided. Put simply, the lack of *Miranda* warnings on September 3rd do not infect the subsequent interrogation on September 10th. As discussed above, there was no Fourth Amendment violation on September 3rd to support the doctrine, and derivative evidence obtained following a violation of *Miranda* is not to be suppressed absent a true Fifth Amendment violation. Therefore, this doctrine fails to exclude Aker's statements made to the PSP on September 10th.

---

[17]    The second *Willaman* factor weighs in favor of a finding that Aker is not in custody because there were only two officers in the home. This substantially reduced the police-dominated nature of the interrogation as compared to the interrogation on September 3rd. The third *Willaman* factor weighs in favor of a finding that Aker is not in custody because Aker has not claimed that the length of the interrogation was an extended period of time like the approximately 2.5 hour interrogation on September 3rd. Similarly, the fourth factor weighs in favor of finding that Aker was not in custody because just like the interrogation on September 3rd, police did not physically restrain Aker or threaten the use of force. Finally, the fifth *Willaman* factor weighs in favor of finding that Aker was not in custody because she invited the officers back to her home days after they had left as opposed to officers appearing, unannounced, in her backyard at 8 a.m. on September 3rd.

**C.     The Search on September 15, 2015**

Next, Defendant Aker argues that the evidence obtained from a search of Defendants' home on September 15, 2015 should be suppressed as a fruit of constitutional violations that occurred on September 3, 2014.

As explained in Section B above, the fruit of the poisonous tree doctrine is inapplicable. There was neither a Fourth nor Fifth Amendment violation on September 3rd capable of supporting suppression. Moreover, the search followed from the PSP securing a warrant to search Defendants' home. "If an officer obtains a warrant and executes it in good faith, there is no police illegality . . ." and a court should not suppress the evidence discovered. *United States v. Stearns*, 597 F.3d 540, 560 (3d Cir. 2010).

For these reasons, the evidence obtained by the PSP during search of Defendants' residence pursuant to a valid search warrant will not be suppressed.

**D.     The Search on September 25, 2015**

Finally, Defendant Aker argues that the evidence obtained from a search of Defendants' rental car on September 25, 2015 should be suppressed as a fruit of constitutional violations that occurred on September 3, 2014.

Again, the fruit of the poisonous tree doctrine does not apply. There was neither a Fourth nor Fifth Amendment violation on September 3rd capable of supporting suppression. Even if such a violation did take place, the officers who stopped Defendants on September 25, 2015 had an independent basis for the stop–reasonable suspicion of a traffic code violation–and relied in good faith on a properly issued warrant to arrest defendants. *See United States v. Delfin-Colina*, 464 F.3d 392, 397 (3d Cir. 2006) (explaining only reasonable suspicion is required for a routine traffic stop); *United States v. Leon*, 468 U.S. 897, 922 (1984) (concluding that suppression is not a proper remedy when evidence is obtained in objectively reasonable reliance on a warrant.).  Further, following the arrest of Defendants,

officers were within their right to conduct an inventory search of Defendants rental car. *See Illinois v. Lafayette*, 462 U.S. 640, 643-44 (1983).

Therefore, the evidence obtained during the search of Defendant's rental car will not be suppressed.

### III. Conclusion

For the above stated reasons, Defendant Aker's Motion to Suppress will be granted in part and denied in part. Specifically, statements made by Defendant Aker to the PSP on September 3, 2014 will be suppressed because she was not provided *Miranda* warnings as required prior to a custodial interrogation. Further, Defendant Valentine's Motion to Suppress will be denied in its entirety because at no time did PSP officers violate his Fourth Amendment rights.

An appropriate order follows.


 January 22, 2018         /s/ A. Richard Caputo
Date              A. Richard Caputo
               United States District Judge